### LAUGHLIN v. MITCHELL.[*]

#### (*Circuit Court, S. D Mississippi.* 1882.)

1. TRUST—CREATED BY PAROL.

>To establish a resulting trust created by a parol agreement, where the subject of the trust is real estate, the evidence must be clear and satisfactory.

2. SAME—CASE STATED.

>Where a party, the husband of complainant, was largely indebted, and executed a mortgage or trust deed to real property owned by him to trustees, who offered the same for sale to the highest bidder, and the father of complainant became the purchaser thereof and assumed the payment of the creditors of the estate, which was to be made from the income of the property so purchased, the purchaser having agreed by parol that the purchase was made for the benefit of his said daughter, and the daughter remained in possession thereof till the bringing of her suit, *held*, that such parol agreement did not create a resulting trust in such real estate subject only to the incumbrance of the purchase money bid at the sale.

3. SAME—ESTOPPEL.

>Where complainant subsequently accepted and recorded a deed or lease made to her by the purchaser, granting her an estate for life in said real estate, in which lease she acknowledged that the lessor was the sole legal and equitable owner of said real estate, she is estopped from assailing the lease and seeking to have the same declared void, and set aside as a cloud on her title after 10 years' enjoyment of the leased premises, and after the death of the lessor, and the devise of his remainder interest to a third party.

4. SAME—UNDUE INFLUENCE.

>A passage in a letter written to the lessee by the lessor that, in the event of her refusing the terms of the lease and returning it, there is nothing "to prevent his putting an overseer on the place, or to prevent his executors from doing the same thing," where he does not say that he will dispossess her, but leaves her the option of returning the deed, and in that event proposes to leave her in possession of the house, garden, and appurtenances, and an income in place of the provisions of the lease, cannot be construed as undue influence.

In Equity.

[*]Affirmed. See 7 Sup. Ct. Rep. 923.

*Alfred B. Pittman,* for complainant.

*Albert M. Lea,* for defendant.

HILL, D. J. This cause is submitted upon bill, answer, exhibits, and proofs, from which the following undisputed facts appear:

In the year 1846 David McCaleb, then the husband of complainant, was the owner of the land described in the bill and the subject of this controversy. He was largely indebted, and before that time had executed a mortgage or trust deed to secure a debt due one Jacobs, in which complainant joined, conveying to the trustees, Chilton and Searles, this tract of land, with the slaves and personal property thereon. The trustees, having advertised the time and place of sale, proceeded on the fifteenth of June, 1846, to offer the same for sale to the highest bidder for cash. There were present at the sale Jonathan McCaleb, an uncle of David McCaleb, who held a large debt against his nephew, and other creditors, or their counsel, who bid more or less for the property sold; but the whole of it was either struck off to Joseph E. Davis, the father of complainant, or the bids were transferred to him, so that he became the purchaser; the aggregate amount of the sales being $28,531. Said Davis, so far as the creditors were concerned, continued to be the owner of the property; but David McCaleb and wife remained in possession as before the sale, up to McCaleb's death, which occurred about one year thereafter. Complainant remained in possession alone up to her intermarriage with E. C. Laughlin, her present husband, and they have remained in possession ever since.

On the twenty-seventh of December, 1858, Joseph E. Davis executed a lease or deed conveying said property, real and personal, to complainant for and during her natural life. This conveyance contained in it an acknowledgment that said Davis was the sole legal and equitable owner of the property. After being duly signed by said Davis, by complainant, and by her husband, it was delivered to complainant, and some five months thereafter it was duly acknowledged by complainant and her husband and recorded in the proper office.

Joseph E. Davis, by his last will and testament, duly probated and admitted to record, devised to the defendant, Joseph D. Mitchell, this land, described as "Diamond Place," then occupied by complainant, and in which, as declared by the will, she had a life estate.

These are undisputed facts.

The bill, in substance, charges that Joseph E. Davis made the purchase mentioned as trustee for the complainant, with the understanding that the income of the property so purchased should be applied to the payment of the purchase money, and that so soon as the same was paid to those to whom it was due, or so soon as complainant should refund to her father the sum he might have to pay to discharge the purchase money due, he would convey to the complainant all the legal and equitable title to the property, real and personal.

In other words, that by said parol agreement he became her trustee, and held the property as such, subject only to the incumbrance of the purchase money bid at said sale. This allegation is denied by the answer, which raises the first question to be determined.

The bill further charges that the lease, with the declaration of title in Joseph E. Davis, the lessor, executed on the twenty-seventh day of December, 1858, was procured by the threats and undue influence of said Davis, and is therefore null and void. This is also denied in the answer, and raises the second and more important question.

The prayer of the bill is that this lease be declared void and set aside as a cloud upon complainant's title to this land, the allegation of the bill being that all the purchase money has been paid, or, if not, that an account of the balance due be taken, which complainant declares she is ready and willing to pay; and that upon the ascertainment that she has fully paid all such sums as in equity she ought to have paid, or upon her payment thereof now, that she may be decreed to have the absolute, indefeasible title of said property as against defendant.

These questions will be considered in the order stated.

It is admitted that the testimony of the complainant as to the understanding and agreement between her and her father, relating to the creation of the alleged trust, is incompetent and cannot be considered. Aside from this testimony there is no direct evidence going to establish the agreement or understanding upon which the alleged trust is based. Quite a number of witnesses testify that the general understanding in the neighborhood was that Mr. Davis had purchased the property for the benefit of complainant. This testimony, when all the weight claimed for it is given, fails to establish the trust asserted, for it only goes to establish the fact that the purchase was intended for complainant's benefit, and this would be fulfilled by giving her and her family a home and a support from the proceeds for a longer or shorter time. The most direct testimony bearing upon the understanding of the parties is found in the written correspondence between them, commencing with the letter of Joseph E. Davis to his daughter, September 12, 1849. This letter, so far as it relates to the question under consideration, is as follows:

"Your letter by Jim was duly received. I am sorry to find you so much under the influence of idle gossip. The opinion of others, in such matters as relate to our moral conduct, it is right to respect. Such as would inquire into the private affairs of others is entitled to as much respect as is the cackling

of geese, and we must feel humbled in our own estimation when we would allow them to exercise an influence on our conduct, or affect our happiness.

"But to come to the subject of your letter. I had assured you that, by will, I had left the Diamond Place to you, subject to the debt due upon it, which is now about $20,000, now due and payable to the house of Wm. Laughlin & Co. How much more may be incurred in the course of litigation I am unable to say. I certainly have not interfered in its management, except such aid as I could give it, and am surprised to hear that Mr. Laughlin felt any apprehension or hesitation from the fear that I would not approve his acts. I expected that from his want of experience he would hesitate, and, when convenient, consult me for his own advantage; yet in all matters of evident propriety he would not wait for advice. You ask my opinion upon his return to New Orleans. I am as little able to answer as any one. I suppose his business or interest in the house to be worth more than the proceeds of the plantation. I did not know his means, or the necessity of his continuance, the probable income of the house, or any other fact to enable me to form any opinion. Now, if Mr. L. has the means and is disposed to pay the amount due upon the estate, I will, or you may, as the case may be, execute a mortgage to secure him in this advance.

"I mentioned in former letter to you that from no want of confidence in Mr. L., but from a desire to secure you against any misfortune that even the most prudent are liable to, I thought it best, both for your interest as well as his, that your property be kept separate. I still think so. I cannot understand your sensibility in the matter. Things are in precisely the same situation they have been for years past. I have interfered no further now than formerly. You, nor any one else, as far as I know, thought you could be degraded by dependence on your father. I expected Mr. Laughlin to exercise all the authority that was necessary and proper for the government of the place, and to act in all respects for your common benefit, and, so far as my wishes are concerned, prefer his remaining.

"The proceeds of the place will require time and economy to pay the debts, and if he could accomplish it at an earlier day by returning to New Orleans, it is a sacrifice you should make for his advantage. But it would not do for you to accompany him before the season of yellow fever was over.

"I would say in conclusion that I have no interest of my own that is to be affected. The interest is yours, and as it is likely to affect you only, am I influenced."

To this letter Mrs. Laughlin soon after replied in substance as follows:

"We both know that all you propose is for our benefit. Nothing can affect that conviction, but others have imagined that you withheld the title from me because you were afraid to trust him with the management of the place. Might he not, sensitive as he is, think so too? By economy we can pay the debt, and such economy we will exercise, but then he wishes your unlimited confidence. Mr. Laughlin is too noble and true-minded, too disinterested, to care whether the property was in my name or his, in any ordinary case. In

this, he has often said he would only live here in case it was secured to me, for he takes the same view of the matter you do, and thinks it safest to guard against misfortunes that can affect others as well as ourselves. In my obscure way of writing I often mislead you with regard to myself. I am always pained to see it, but still more so when I think I have injured in your good opinion one so much more deserving as Edmund is."

These letters and others, together with other testimony bearing on the point, I am satisfied establish the fact that Joseph E. Davis purchased this property with the purpose of letting McCaleb, his then son-in-law and complainant, remain on the plantation and control it, with the slaves and other personalty, intending to hold the legal title to all of it, and making himself personally responsible for the expenses of the place; but that the income should be applied to the payment of these expenses, and also the personal expenses of his son-in-law and daughter, and the remainder applied to the purchase money, for which he was liable. When this was done, he would convey or secure by his will a title to complainant, whether in fee or only for life does not very clearly appear.

No complaint seems to have been made to the condition of affairs during the life-time of McCaleb or the widowhood of complainant. But after her intermarriage with E. C. Laughlin, which occurred about two years after the sale, and before the letter of Joseph E. Davis of September 12, 1849, and within a year after this marriage, a desire sprung up, no doubt originating with Mr. Laughlin, in which his wife sympathized, to obtain the legal title. Hence the appeals of Mrs. Laughlin in that regard. Complainant during all this time, recognized the title to the property as being in her father, and that it was incumbered for the payment of the balances of the purchase money, to whomsoever it might be due.

This condition of the property and state of the title continued until December, 1858, when the lease referred to was executed. The proof shows that when this instrument was executed Mr. Davis was in bad health, and, the probabilities are, desired this matter settled. Having, whether right or wrong, all the time regarded himself as the legal and equitable owner of the property, with full power to dispose of it as he might think proper, he did not desire to leave any controversy arising out of it to be settled after his death. It appears from the evidence that complainant was childless, and was likely to remain so; that Mr. Davis had a dislike for the children of William Laughlin, who had been left orphans, and whom complainant and her husband had taken to raise and educate, and to Laughlin himself,

Doubtless, for those reasons, he desired to limit the title in his daughter to a life estate.

The proof discloses that Mr. Davis sent for his daughter, and afterwards for her husband; that he had prepared the instrument called the lease, and, after signing it himself, requested complainant and her husband to do so. Finding that it conveyed only a life estate, they were very much dissatisfied with its provisions, and signed it with reluctance. They left and did not return, but carried the lease with them.

On January 4, 1859, and nine days after the execution of the lease, Joseph E. Davis, in reply to a letter received from Mrs. Laughlin, wrote her as follows:

"I am sorry to receive such a letter from you, my dear child. You write as if I had deprived you of something that was yours, and speak of your being made a tenant at will. Now it is exactly what the deed is intended to prevent. There is nothing now to prevent my putting an overseer on the place, or to prevent my executors from doing the same thing. If you think your situation is to be bettered you may return the deed. I will leave you in possession of the house and garden, and appurtenances, with an income.

"As to statement of account, much of it has no relation to my purchase, the Guion debt and the Jacob debt. But you will recollect that nothing has been paid but from the proceeds of the place, which is mine. I leave you in the full enjoyment of the income for life. Now, who has the right to dispose of the earnings of his labor? I very much regret any feeling of the kind, and would still more regret any publicity by taking possession of the place or exercising authority over it, but it seems no generosity or line of conduct is satisfactory."

The lease or deed was retained by complainant and her husband until the thirty-first day of May, 1859, and then by them acknowledged and put on record. Mr. Davis did not acknowledge it. It in substance conveys the property for life to complainant, and Mrs. Laughlin and her husband covenant to manage it in a husband-like manner, and at the termination of the lease to quietly surrender the same to said Davis or his representatives; and then follows the acknowledgment that the sole, legal, and equitable title and right of property is in said Joseph E. Davis. This lease left Mrs. Laughlin in possession of the property for life, free from any obligation to pay any part of the debts of the place, or the balance of the purchase money due, which, including the sum due William Laughlin & Co., in the fall of 1849, amounted to $20,000, for which Joseph E. Davis acknowledged himself bound, and which, except such part as was

afterwards paid from the proceeds of the plantation, it is to be presumed he paid, as he was solvent. To this must be added $4,525, recovered after that time in the Guion suit, and how much more Davis paid cannot be ascertained from the proofs submitted. An examination of the account of sales of cotton from the plantation for the year commencing November 15, 1849, and including November 27, 1850, shows that they amounted to $4,168.63, while the account of William Laughlin & Co., with the Diamond Place, from April 1 to November 15, 1850, shows charges, other than those connected with the payment of the purchase money, or anything due to said Davis, of $5,893, thus showing that this indebtedness was increased instead of diminished. Indeed, the account shows on November 20, 1850, a balance due William Laughlin & Co. of $22,830. It is very evident from all the proof that there continued to be a large balance due against Diamond Place, either to Mr. Davis or to others, to whom he was bound at the time the lease was executed. But other questions presented under the pleadings and proofs render it unimportant to examine further into these accounts.

Has Mrs. Laughlin shown such a title, legal or equitable, to the lands in controversy as entitles her to have the cloud upon her title removed according to the prayer of the bill? If not, the bill must be dismissed. But, if she has shown such title, the next question is, does it appear that the lease or instrument of December 27, 1858, is such a cloud as a court of equity, by its decree, will declare void and remove? It is not claimed that a *resulting trust* has been established. The trust asserted is one created by a *parol agreement*. Now, when the subject of the parol trust is real estate, all the authorities hold that to establish it the evidence must be clear and satisfactory. There being no conflict as to this rule, reference to the authorities is unnecessary. Applying the rule to the evidence in this case, I am of opinion that the trust is not sufficiently established.

It is insisted that at the sale it was understood that Davis was purchasing the property for complainant, and that on that account Jonathan McCaleb and others present refrained from bidding, or did not bid as much as they otherwise would. The proof is somewhat conflicting on this point, but the weight of the evidence is that all bid who desired to do so, and that Davis complained that it was run up on him by Jonathan McCaleb and others who held large demands against David McCaleb.

The testimony shows that Joseph E. Davis contracted with the overseer for the year 1849, as appears from his letter to E. C. Laugh-

lin, in which he informs him of the number of bales of cotton the overseer was to receive. As already stated, the proof shows that both parties regarded Mr. Davis as holding the legal title, and the right to have the income of the plantation applied to the payment of the purchase money bid by him at the sale, and the other claims against the Diamond Place. Complainant could not claim under those circumstances to have the title conveyed to her until all these demands were satisfied, even admitting the understanding between her father and herself at the time of the sale, as alleged in her bill. I am satisfied from the proofs that this was not done at the time the lease or deed of 1858 was executed.

The parties were competent to act and to contract between themselves, and, no fraud, mistake, or undue influence intervening, had a right to enter into the contract or agreement set forth in the deed or lease of 1858. That Mrs. Laughlin is a woman of unusual intelligence, and was then with a sufficient amount of will power to contract and to manage her own affairs, is apparent from her different letters in evidence; and that her husband is a man of at least ordinary intelligence, is apparent from his letters and testimony. The proof shows no fraud or deception on the part of Mr. Davis.

There remains only the charge of undue influence. That complainant and her husband did not get the title they desired is manifest. The letter of Mr. Davis of January 4, 1859, is relied upon as constituting a threat that if she did not accept the terms of the lease he would dispossess her and place an overseer on the plantation. The letter does not bear this construction. He says there is nothing now "to prevent his putting an overseer on the place or to prevent his executors from doing the same thing," in the event of her refusing the terms of the lease and returning it. He did not say that he would dispossess her. He leaves her the option of returning the deed, and in that event proposes to leave her in possession of the house, garden, and appurtenances, and an income, in place of the provisions of the lease. She was thus left the option to accept the one or the other, or to refuse both, and stand upon whatever her legal or equitable rights might have been. After waiting nearly five months and deliberating upon the proposition, without any further influence upon the part of her father, so far as the evidence shows, and with ample time to consult counsel and friends, they, and not Mr. Davis, placed the lease on record, thus accepting its terms and enjoying its benefits, with no attempt to revoke it until the filing of this bill, June 25, 1881, a period of nearly 22 years. It does not

appear that any intimation was given to Mr. Davis after that time of dissatisfaction with the terms of the lease, nor was he advised of any intention to assail it during his life-time.

March 18, 1869, Mr. Davis made his will, by which he devised the remainder interest in this real estate to the defendant. Ten years thus elapsing after the lease was recorded by Mrs. Laughlin before Mr. Davis made his will, he was justified in the belief that he had the right and power to devise this remainder interest to whom he pleased, and for this reason, if there were no other, I am of opinion that complainant is estopped from assailing this lease now, and is not entitled to have the same declared void and a cloud upon her title. She was fully cognizant of all the facts in relation to her title, and in relation to the execution of the instrument during the life-time of her father. To wait until after his death, and until after the death of most of the persons who could have had any knowledge of the transaction, and after her father, by will, had disposed of his estate, presumably, in some respects, in a manner otherwise than he would have done had he not believed himself possessed of this property, and then attack his will, would be inequitable and unjust.

Many authorities have been read and commented upon by the learned counsel on both sides, who have presented the questions involved with an ability rarely equaled, in this court, at least; but, with the view I have taken of the facts of the case, the rules of law controlling it are elementary, and a citation of authorities would but extend this opinion, already too long, without throwing further light upon the issues involved.

The result is that the relief prayed for in the bill must be denied, and the cause dismissed at complainant's costs.